UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

|  |  |
|---|---|
| LARRY WAYNE JAMES,<br><br>      Plaintiff,<br><br>v.<br><br>NANCY A. BERRYHILL, Acting Commissioner of Social Security,[1]<br><br>      Defendant. | Case No. 2:15-0052<br><br>Judge William L. Campbell, Jr.<br>Magistrate Judge Newbern |

To the Honorable William L. Campbell, Jr., District Judge

### REPORT AND RECOMMENDATION

Pending before the court is plaintiff Larry Wayne James's motion for judgment on the administrative record (Doc. No. 17), to which the Commissioner of Social Security has responded (Doc. No. 19). Upon consideration of these filings and the transcript of the administrative record (Doc. No. 11),[2] and for the following reasons, the undersigned RECOMMENDS that James's motion be DENIED and the decision of the Commissioner be AFFIRMED.

**I.    Introduction**

James filed his application for SSI benefits under Title XVI of the Social Security Act on November 27, 2011, alleging disability beginning on that date due to neurological problems and arthritis in his elbows and knees. (Tr. 13, 150.) His application was denied at the initial and reconsideration stages of state agency review, and he requested de novo review of his case by an

---

[1] Nancy A. Berryhill became the Acting Commissioner of Social Security on January 23, 2017, replacing Carolyn W. Colvin in that role. Berryhill is therefore appropriately substituted for Colvin as the defendant in this action, pursuant to Federal Rule of Civil Procedure 25(d) and 42 U.S.C. § 405(g).

[2] Referenced hereinafter by the abbreviation "Tr."

Administrative Law Judge (ALJ). The ALJ heard the case on June 4, 2014, when James appeared with counsel and gave testimony. (Tr. 31–61.) A vocational expert also testified. At the conclusion of the hearing, the matter the ALJ took the case under advisement until October 31, 2014, when she issued a written decision concluding that James is not disabled. (Tr. 13–24.) That decision contains the following enumerated findings:

1. The claimant has not engaged in substantial gainful activity since March 28, 2012, the application date (20 CFR 416.971 *et seq.*).

2. The claimant has the following severe impairments: Essential Tremor Syndrome, benign, bilateral; Status post Right Elbow Fracture; Hypertension; Chronic Obstructive Pulmonary Disease (COPD); Depressive disorder; and History of Polysubstance Abuse (20 CFR 416.920(c)).

3. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except the claimant can frequently climb ramps or stairs, and he can occasionally climb ladders, ropes, and scaffolds. The claimant can frequently balance, stoop, kneel and crouch, and he can occasionally crawl. The claimant can never reach above the shoulder with the right upper extremity. Additionally, the claimant can understand and remember simple and detailed tasks, but he cannot perform executive level tasks. The claimant can interact appropriately with coworkers and supervisors, but only occasionally with the public. The claimant can also adapt to infrequent changes in the workplace that are gradually introduced.

5. The claimant is unable to perform any past relevant work (20 CFR 416.965).

6. The claimant was born on April 5, 1968, and was 43 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).

7. The claimant has a limited education and is able to communicate in English (20 CFR 416.964).

8. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has

transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

10. The claimant has not been under a disability, as defined in the Social Security Act, since March 28, 2012, the date the application was filed (20 CFR 416.920(g)).

(Tr. 15–17, 22–24.)

On August 4, 2015, the Appeals Council denied James's request for review of the ALJ's decision (Tr. 1–3), rendering that decision final. This civil action seeking review was timely filed on September 24, 2015. 42 U.S.C. § 405(g).

## II. Review of the Record

The following summary of the evidence is taken from James's memorandum in support of motion for judgment on the administrative record (Doc. No. 18, PageID# 406–15) and is not opposed in any material way by the Government's statement of facts (Doc. No. 19, PageID# 1422):

1. Medical Records

Mark Loftis, M. A. completed a consultative examination on May 22, 2012. [James] alleged problems with his nerves, elbow and knee arthritis, difficulty concentrating, and vision loss. His sister drover him to the appointment. A slight tremor was noted in his hands and head. He was cooperative and put forth good effort during the exam. Mr. James had not worked since last September. He was working for a masonry contractor and was let go after six months for "being a drunk." He worked as a housing framer for five years before working for the masonry company. He has worked in construction mostly throughout his work history. As a young man, he used to work in logging. He stated that he does not participate in community activities. He has had numerous legal charges in the past. Most of the charges were related to domestic situations and to DUI's. He had a valid driver's license. He did not have medical insurance at this time. He went to Dr. Melvin Blevins in Smithville, TN for medical care. He has been diagnosed with knee problems. He denied having seizures or blackouts in the past. He reported receiving counseling and psychiatric services in the past at Plateau Mental Health Center. He has also been to alcohol and drug treatment at CADAS and at Rebos. He has never had surgery. He was not taking prescription medications at this time. He smoked about a pack of cigarettes per day. He used alcohol. He reported he may drink a 12-pack

3

of beer per day. He smoked marijuana two or three times per week. He denied the use of illicit substances. He lived in a mobile home in rural Putnam County, TN. The home belonged to his mother before her death. He performed few of the household chores. His sister did some of the cleaning. He cooks breakfast and then eats a sandwich later in the day. His sister keeps up with and pays the bills. He gets Food Stamps. His sister did the grocery shopping for him. He went to bed about 9:00 PM and typically wakes up about 7:00 AM. He naps during the day. He is independent in his personal hygiene and toileting needs. He spends much of the day outside. He likes to fish. He watches some television. He socializes mostly with his family members, but he does have four or five friends that he socializes with. He only drives in his local community. On the day of the evaluation, he was oriented in all spheres. He could recall his social security number. There were no suicidal or homicidal ideations noted. He did put forth good effort during the course of the evaluation. He appeared to be a reliable personal historian. Although no formal evaluation [or] intelligence test was requested, he appeared to be in [the] average range of intellectual functioning. The claimant is not currently receiving psychiatric or counseling services. He is not taking medication for anxiety or a mood disorder. He stated that he has never taken medication for any type of psychiatric disorders. He reported crying spells about once per day. He felt like "the world is coming to an end." He did not want to be around people at times. He denied hallucinations. He daydreams at times. He denied suicidal and homicidal ideations. He worries about his financial issues. He states he drinks to "calm his nerves." He states that the marijuana helps him to concentrate more on what he is doing and slows his mind from wandering. He started drinking alcohol and smoking marijuana when he was about fourteen. He quit both for about a year in the past. He was attending church. He was asked to give a subjective rating of the severity of his depressive symptoms on a 10-point scale. He rated his depressive symptoms as a 7 out of 10. He was diagnosed with depressive disorder, alcohol abuse, and cannabis abuse. [Mr. Loftis] opined that Mr. James has a mild impairment to understand and recall instructions. Simple, repetitive tasks were not likely to be significantly impaired. He further opined that Mr. James has a mild impairment in concentration skills, persistence, and ability to maintain a competitive pace, and that he apparently has problems with social interactions. Mr. James is mildly impaired in social interaction skills necessary to deal with coworkers and supervisors. Mr. James was mildly to moderately limited in his ability to adapt to changes found in most work situations. He found Mr. James capable of managing his own funds. (Tr. 238–243).

On May 30, 2012, George Davis, Ph. D. completed a psychiatric review technique finding [James] has a mild restriction of activities of daily living; mild restriction in regards to difficulties in maintaining social functioning; and moderate restriction in regards to difficulties in maintaining concentration, persistence and pace. He also completed a mental residual functional capacity assessment. He opined that Mr. James has a mild limitation in his ability to maintain attention and concentration for extended periods. His ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods is

moderately limited. His ability to respond appropriately to changes in the work setting is moderately limited. (Tr. 244–261).

On June 6, 2012, Melvin Blevins, M.D. completed a consultative exam. Allegations include nerves, arthritis in the elbows and knees, difficulty understanding, concentration problems, and vision loss; constant anxiety and occasional depression; significant tremors in the upper and lower extremities and per the report it feels like he has tremors throughout his entire body; he wears reading glasses; bilateral knee pain, greater on the left than the right; and he previously had fluid drawn off the left knee. He has difficulty comprehending and concentrating and suffers from intermittent swelling of the feet and ankles. He has previously been prescribed medication for hypertension. He states he took this medication for one week and stopped on his own. He stated he could walk 5 hours, stand 30 minutes, and lift 50 pounds. He has difficulty with grasp and manipulation due to his upper extremity tremors. He said he frequently drops items. He is divorced with one child. He can read and write but has difficulty with comprehension. He worked as a carpenter framing houses. He has not worked since November 2011. He smoked ½ pack per day for 15 years. He was drinking a 12-pack per day and had a history of smoking marijuana. He was assessed with COPD, tobacco abuse, osteoarthritis, musculoskeletal pain disorder, generalized anxiety disorder, depression, physical findings suggesting PVD [(peripheral vascular disease)], alcohol use syndrome with daily consumption, marked tremor consistent with benign essential tremor syndrome, and progressive degenerative arthritis involving both the right and left knee. Extension of the dorsolumbar spine was reduced to 15° and flexion was reduced to 80°. He had reduced flexion of the fourth metacarpophalangeal on the left at 85°. Extension of the 2nd through 5th distal interphalangeal joints was as follows: 2nd -10° on the right and left, 3rd -5° on the right and -20° on the left, 4th -5° on the right and -10° on the left, and 5th -15° on the right and -20° on the left. Grip was 4/4. Pinch was 3/4. Tinel's was negative. He had marked tremor in the bilateral upper extremity. Dr. Blevins opined that Mr. James could lift less than 50 pounds occasionally, perform no frequent lifting, stand less than 3 hours per day and sit less than 6 hours per day. (Tr. 262–269).

On July 16, 2012, pulmonary function test revealed FEV1 of 3.23; FVC 4.05. He was unable to sustain for six seconds. Results were not reproducible. Chest x-ray revealed a small ill-defined rounded nodule, left upper lung, noted to be probable non-calcified granuloma. (Tr. 270–277).

On August 6, 2012, Larry McNeil, M.D. completed a physical residual functional capacity assessment. Dr. McNeil found Mr. James limited to lifting 50 pounds occasionally, 25 pounds frequently, and standing, walking or sitting 6 hours in an 8-hour workday. He is limited to frequent climbing of ramps and stairs, balancing, stooping, kneeling and crouching, and occasionally climbing ladders, ropes or scaffolds and crawling. Handling and fingering is limited to frequently. (Tr. 278–286).

5

On September 10, 2012, Mr. James was seen at the Putnam County Health Department for bilateral upper lobe expiratory wheezing. A benign granuloma was seen on x-ray. It was noted that he smoked one pack per day. The provider assessed Mr. James with hypertension, abnormal chest x-ray and high BMI. He was placed on a Ventolin inhaler. He was advised to lose weight and stop smoking. Chest x-ray was ordered. (Tr. 289–290, 313–314).

On November 14, 2012, Mr. James returned to the health department and was assessed with hypertension, smoking, alcohol abuse and elevated BMI. He was advised to stop drinking alcohol, stop smoking, and lose weight. A Z-pak and Guiatussin were prescribed. Metoprolol was refilled. (Tr. 312). He was seen at Cookeville Regional Medical Center the same day. Imaging revealed a stable tiny nodule in the left upper lung zone most likely representing a granuloma and streaky densities medially in the right base probably representing vascular crowding. An early infiltrate could not be excluded. He was assessed with hemoptysis [not otherwise specified]. (Tr. 351).

On November 30, 2012, Mr. James returned to the health department. Metoprolol 50mg twice daily was prescribed. (Tr. 309–310). On January 2, 2013 and January 28, 2013, Mr. James returned to the health department. His diagnosis remained unchanged. (Tr. 304–308). On April 29, 2013, he returned to the health department. He was assessed with hypertension, elevated BMI, daily alcohol use and essential tremor related to alcohol. (Tr. 303–304). On June 20, 2013, he returned to the health department and was treated with Keflex for a puncture wound injury (from a nail). He was referred to mental health care and AA but declined. Alcohol cessation was encouraged. A low fat diet was recommended. (Tr. 300–301).

On July 10, 2013, he returned to the health department. He was assessed with hypertension, alcohol abuse and smoking. He was again advised to lose weight and stop alcohol and smoking. (Tr. 299, 347–348).

In March 2014, Mr. James was treated at Riverview Regional Hospital following a motor vehicle accident where he was ejected from the car. He sustained injuries to the head, neck, upper back, low back and chest. He had pain in these areas as well. He also had a facial contusion, injury to the abdomen, bloody nose, swollen right eye lid, right elbow contusion, ecchymosis, . . . decreased range of motion, . . . hematoma, painful injury, and swelling. . . . CT of the face revealed peri-orbital air right eye without fracture and soft tissue swelling of the right eyelid. Small opacities were noted to be possible debris in the nasal passages. CT of the lumbar spine revealed degenerative disc disease with no acute fracture or subluxation. Right view of the elbow revealed olecranon fracture. CT of the abdomen and pelvis was normal. His right elbow was placed in an orthoglass splint and sling. Ibuprofen was prescribed for pain and Norco was prescribed for more severe pain. He was to apply ice as needed. It was noted that he smelled of alcohol and admitted to drinking. A cervical collar was placed. He was diagnosed with a nasal contusion,

orbital contusion on the right, chest contusion, and olecranon process of ulna fracture on the right. (Tr. 315–344).

On April 9, 2014, Mr. James was seen at Vanderbilt for follow up of his right elbow fracture and reported rib fractures. He reported he apparently fell asleep at the wheel. He was mildly tremulous on exam. His chest was tender over the right side of his chest wall. X-ray of his elbow revealed displaced but not particularly comminuted olecranon fracture. He had diffuse tenderness over the olecranon medial and lateral condyle. He could extend his elbow to approximately 160°. He was placed in a posterior splint and Lortab 5mg was prescribed. He was to follow up with orthopedics. (Tr. 355–361).

He returned to the health department on April 11, 2014 and was assessed with hypertension, alcohol abuse, and being a smoker. He was advised to lose weight, stop smoking, and alcohol treatment was recommended. (Tr. 345–346).

2.	Hearing Testimony – June 4, 2014

Mr. James testified that he was born on April 5, 1968 and was 46 years old at the time of his hearing. He went through 10th grade in school. (Tr. 34). He lived alone and had a 25 year old son. (Tr. 35).

He testified that he was fired from his last job because he would not work in the rain. His ride was with block layers and he left when they left. Prior to that job, he was logging and framing houses for cash. He earned around $200 per week. In 2000 and 2001, he worked for Airborne Express as a mechanic. He quit working there because he was not satisfied with a change in job duties and expectations. (Tr. 35–36).

He testified that prior to his motor vehicle accident, he was driving to the store and back on a daily basis. His sister drove him to the hearing. He was 5'9" and 190 pounds at the time of the hearing. (Tr. 37). He is right handed. His is unable to work because he has a tendency to drop things and he is unable to climb due to his nerves. He began dropping things two years earlier. He had been to the Health Department and was advised that he needed to see a neurologist by Zelda Carter, but she was unable to refer him because the health department does not do referrals. He testified that his left hand was worse than his right. (Tr. 38).

Prior to his accident in March 2014, his knees were his biggest problem. He also had difficulty with his back and shoulders, partially due to loss of cartilage. He had been to Dr. Blevins for his knee problem. (Tr. 39).

The motor vehicle accident resulted in his shattering his elbow and it was not reset. He was able to bend his elbow to a certain extent, but he was unable to straighten it out. (Tr. 39). He was unable to lift his right arm above his shoulder. (Tr. 40).

He testified that he has "tunnel vision" and he is unable to see things that are right beside him. He could barely see his attorney at the hearing. (Tr. 41). He broke his ribs, broke his nose in two places, broke his cheekbone and bruised his knee. He was sent to Vanderbilt and their main concern was his shattered elbow. (Tr. 41). He said that he had daily pain in his back, legs and elbow and he rated his pain a 10 of 10 at the time of the hearing. (Tr. 42). Ibuprofen brought his pain from a 10 of 10 to a 6 of 10. (Tr. 43).

He testified that he is able to lift 20 or 25 pounds and he can stand one hour or two. He can walk 30 minutes and sit 30 minutes before having to change positions. He was able to mop, sweep and vacuum prior to his accident, but unable to do those chores following his accident. He no longer shopped because he had problems tolerating people he did not know. (Tr. 44). He fished at one time but had been unable to do so in a couple of years. (Tr. 44–45).

He testified that he smoked one pack per day of cigarettes. He drank 3 to 4 beers daily. He used marijuana two weeks prior to the hearing and took Hydrocodone that was not prescribed at times. He was arrested in 2009 for a DUI. (Tr. 46).

He testified that the tremor in his knees keeps him from walking or climbing. His knees "pop out" with a lot of walking. Even before his wreck, the tremor in his hands caused problems with his writing ability and problems holding things. His writing looks like [hen] scratching. He has difficulty eating because he will get the food up to his mouth and it will fall off causing him to use two hands. (Tr. 47).

He testified that he went to Tennessee Preparatory School at age 14 to 15 where they advanced him from 7th to 9th grade. He was sent there for skipping school at Upperman High. He went to Upperman High School for one week after leaving Tennessee Preparatory School. He had difficulty staying focused and could not read when he heard noises. He failed 7th grade twice. He testified that he had difficulty doing the course work even in his 2nd year of 7th grade. (Tr. 49).

He explained that his vision was blurry to the right and to the left. When he watches television, his eyes will burn and water after 15 minutes and he will turn it off. He has trouble with reading comprehension. He had to take his driver's test twice. (Tr. 50–51).

He testified that he had numbness in three fingers on his right and left hands. The numbness in his left hand came on after his accident, but the numbness in the right hand preceded the accident. He testified that he had headaches following the accident. His neck muscles would draw up and he had pain in the center of his head. His pain will reach a level 10 of 10 and last for 30 minutes to an hour. He uses ice for some temporary relief. (Tr. 52). He said he had problems with dizziness following his accident. He would see black dots and he had fallen twice as a result since his accident. (Tr. 53). He has problems with cramping up between his

shoulder blades and he testified that his nerve problem was due to shaking which made it difficult to eat, drink or hold onto things. (Tr. 53–54).

3. Vocational Expert Testimony

The Vocational Expert, Ernest Brewer, testified that an individual with the claimant's age, education, work experience and residual functional capacity for light work with frequent climbing of ramps and stairs, occasional climbing of ladders, ropes and scaffolds, frequently balance, stoop, kneel or crouch, occasionally crawl, can never reach above the shoulder level with the right upper extremity, can understand and remember simple and detailed instructions but not executive level function, can interact with supervisors and co-workers but only occasionally with the general public, and can adapt to infrequent changes in the workplace gradually introduced, could perform the requirements of representative occupations such as: fast food worker (DOT 311.472-010), light, unskilled (SVP-2), with 18,400 in the regional economy and 891,900 in the national economy; gate keeper/tender (DOT 372.667-030), light, semi-skilled with no executive tasks (SVP-3) with 14,000 in the regional economy and 410,000 in the national economy; cleaner (DOT323.687-014), light, unskilled (SVP-2) employing 19,200 in the regional economy out of 894,900 in the national economy; and laundry folder (DOT 369.367-018), light, unskilled (SVP-2) employing 3,200 in the regional economy out of 175,000 in the national economy. The vocational expert testified that the following occupations could be performed at the sedentary exertional level with the same non-exertional limitations as given above: Assembler (DOT 732.684-062), sedentary, unskilled (SVP-2) employing 3,874 in the regional economy out of 200,396 in the national economy; Finisher (DOT 731.687-014), sedentary, unskilled (SVP-2), employing 1,800 in the regional economy out of 125,000 in the national economy; and inspector/grader (DOT 726.684-050), sedentary, unskilled (SVP-2), employing 3,360 in the regional economy out of 136,200 in the national economy. (Tr. 55–58).

The Vocational Expert testified that if Plaintiff could sit six hours in an 8-hour day and he had a marked tremor causing him not to be able to hold onto items, he would not be able to maintain the above jobs. If he were restricted to sedentary work but he had pain at a level of moderately severe to severe level at least 15 minutes out of every hour, he would not be able to maintain competitive employment. (Tr. 58–59).

(Doc. No. 18, PageID# 406–15.)

## III. Analysis

### A. Legal Standard

Judicial review of "any final decision of the Commissioner of Social Security made after a hearing" is authorized by the Social Security Act, which empowers the district court "to enter,

upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). This Court reviews the final decision of the Commissioner to determine whether substantial evidence supports the agency's findings and whether the correct legal standards were applied. *Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 833 (6th Cir. 2016). "Substantial evidence is less than a preponderance but more than a scintilla; it refers to relevant evidence that a reasonable mind might accept as adequate to support a conclusion." *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2014). The Court also reviews the decision for procedural fairness. "The Social Security Administration has established rules for how an ALJ must evaluate a disability claim and has made promises to disability applicants as to how their claims and medical evidence will be reviewed." *Id.* at 723. Failure to follow agency rules and regulations, therefore, "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Id.* (quoting *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)).

The agency's decision must stand if substantial evidence supports it, even if the record contains evidence supporting the opposite conclusion. *See Hernandez v. Comm'r of Soc. Sec.*, 644 F. App'x 468, 473 (6th Cir. 2016) (citing *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). This Court may not "try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility." *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 713 (6th Cir. 2012) (quoting *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007)). "However, a substantiality of evidence evaluation does not permit a selective reading of the record . . . [but] 'must take into account whatever in the record fairly detracts from its weight.'" *Brooks v. Comm'r of Soc. Sec.*, 531 F. App'x 636, 641 (6th Cir. 2013) (quoting *Garner v. Heckler*, 745 F.2d 383, 388 (6th Cir. 1984)).

### B. The Five-Step Inquiry

The claimant bears the ultimate burden of establishing an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The claimant's "physical or mental impairment" must "result[] from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *Id.* § 423(d)(3). The agency considers a claimant's case under a five-step sequential evaluation process, described by the Sixth Circuit Court of Appeals as follows:

1. A claimant who is engaging in substantial gainful activity will not be found to be disabled regardless of medical findings.

2. A claimant who does not have a severe impairment will not be found to be disabled.

3. A finding of disability will be made without consideration of vocational factors, if a claimant is not working and is suffering from a severe impairment which meets the duration requirement and which meets or equals a listed impairment in Appendix 1 to Subpart P of the Regulations. Claimants with lesser impairments proceed to step four.

4. A claimant who can perform work that he has done in the past will not be found to be disabled.

5. If a claimant cannot perform his past work, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed.

*Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 835 n.6 (6th Cir. 2016); 20 C.F.R. §§ 404.1520, 416.920. The claimant bears the burden through step four of proving the existence and severity of the limitations her impairments cause and the fact that she cannot perform past relevant work; however, at step five, the burden shifts to the Commissioner to "identify a significant number of

jobs in the economy that accommodate the claimant's residual functional capacity and vocational profile." *Johnson v. Comm'r of Soc. Sec.*, 652 F.3d 646, 651 (6th Cir. 2011).

When determining a claimant's residual functional capacity (RFC) at steps four and five, the ALJ must consider the combined effect of all the claimant's impairments, mental and physical, exertional and nonexertional, severe and nonsevere. *See* 42 U.S.C. § 423(d)(2)(B), (5)(B); *Glenn v. Comm'r of Soc. Sec.*, 763 F.3d 494, 499 (6th Cir. 2014) (citing 20 C.F.R. § 404.1545(e)). The agency can carry its burden at the fifth step of the evaluation process by relying on the Medical-Vocational Guidelines, otherwise known as "the grids," but only if a nonexertional impairment does not significantly limit the claimant, and then only when the claimant's characteristics precisely match the characteristics of the applicable grid rule. *See Anderson v. Comm'r of Soc. Sec.*, 406 F. App'x 32, 35 (6th Cir. 2010); *Wright v. Massanari*, 321 F.3d 611, 615–16 (6th Cir. 2003). Otherwise, the grids function only as a guide to the disability determination. *Wright*, 321 F.3d at 615–16; *see also Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990). Where the grids do not direct a conclusion as to the claimant's disability, the agency must rebut the claimant's prima facie case with proof of the claimant's individual vocational qualifications to perform specific jobs, typically through vocational expert testimony. *Anderson*, 406 F. App'x at 35; *see Wright*, 321 F.3d at 616 (quoting SSR 83-12, 1983 WL 31253, *4 (Jan. 1, 1983)).

### C. James's Statement of Errors

James first argues that the ALJ erred in failing to include the significant tremor in James's upper extremities in her RFC finding restrictions on fingering and handling. While the ALJ identified bilateral benign essential tremor syndrome as among James's severe impairments (Tr. 15), she ultimately concluded that "the medical evidence of record . . . showed no more than mild limitations due to COPD, benign essential tremors, or hypertension[,]" and that the symptom severity James claimed from this condition was inconsistent with the objective medical evidence.

(Tr. 19–20.) Indeed, the few instances where James's tremors are mentioned in the medical record are not accompanied by any particular discussion of severity or treatment options; the only accompanying comment appears to be advice that James stop drinking. (Tr. 304.) While Dr. Blevins, the consultative examiner, noted a marked tremor on the day of his June 2012 exam, he did not assign any corresponding limitation in his functional assessment of James. (Tr. 265, 267.) The psychological consultant, Mr. Loftis, observed a slight tremor in James's hands and head during his May 2012 exam, but noted that James's fine and gross motor skills appeared normal. (Tr. 238.) On August 6, 2012, nonexamining state agency physician Dr. McNeil noted the discrepancy between the two consultants' observations of the tremor (slight vs. marked) (Tr. 285) and found that James's work limitations should include handling and fingering on no more than a frequent basis (Tr. 281).

The ALJ gave great weight to Dr. McNeil's opinion that James could perform medium exertional work because that opinion aligned with the evidence that James's tremors, COPD, and hypertension caused no more than mild limitations.[3] (Tr. 19–20.) She did not adopt the restriction to no more than frequent fingering or handling in her RFC determination. The ALJ's failure to adopt any specific manipulative restriction in her RFC finding is substantially supported by the fact that James's hand tremor is barely mentioned in the medical evidence, as well as the fact that James is able to engage in activities such as driving, doing household chores, and going fishing, all as noted by the ALJ. (Tr. 21.)

James's sole remaining argument is that the ALJ erred in affording great weight to Dr. McNeil's opinion. James argues that Dr. McNeil "reviewed [his] records twenty-two (22) months before the ALJ hearing" and "did not have access to significant medical records from the period after his assessment that contained evidence of continuing problems with a relevant impairment."

---

[3] Ultimately, the ALJ found that James's RFC was reduced to light exertion with a restriction on right-handed overhead lifting due to a right-elbow injury incurred in a 2014 motor vehicle accident. (Tr. 20.)

(Doc. No. 18, PageID# 418.) James argues that, to properly rely on Dr. McNeil's opinion, the ALJ should have taken into account these later medical records. (*Id.*)

However, the ALJ did explicitly consider the effects of subsequent medical evidence when she reduced her RFC finding from medium to light exertion with additional restrictions because of James's March 2014 car accident and when she cited medical evidence from the period after Dr. McNeil's assessment in her decision (Tr. 20–21). There is no treating source opinion in the record, and the ALJ properly found the consultative examiner's opinion too vague to receive significant weight. (Tr. 19.) Particularly in view of the lack of opinion evidence from the period after Dr. McNeil's assessment and the lack of any treating source opinion from any period, the ALJ's assignment of significant weight Dr. McNeil's opinion, reduced by her accounting of the evidence of James's later injuries, is not erroneous. *Cf. Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 408–09 (6th Cir. 2009); *Fisk v. Astrue*, 253 F. App'x 580, 585 (6th Cir. 2007) (recognizing that reliance upon nonexamining sources is not error in and of itself, but finding error in ALJ's reliance upon earlier nonexaminers' opinions where significant evidence from treating and examining sources post-dated those opinions).

In sum, the ALJ's decision is supported by substantial evidence in the record as a whole. It should be affirmed.

## IV.    Recommendation

For these reasons, the undersigned RECOMMENDS that James's motion for judgment on the administrative record be DENIED and the decision of the Commissioner be AFFIRMED.

Any party has fourteen days after being served with this Report and Recommendation in which to file any written objections to it. A party opposing any objections filed shall have fourteen days after being served with the objections in which to file any response. Fed. R. Civ. P. 72(b)(2). Failure to file specific objections within fourteen days of receipt of this Report and Recommendation can constitute a waiver of further appeal of the matters disposed of therein. *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004).

ENTERED this 22nd day of February, 2018.

                                                Alistair E. Newbern
                                                U.S. Magistrate Judge